UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
JAMES BERTONIS, Individually and on    :   Civil Action No.
Behalf of All Others Similarly Situated,  :
                                     :   <u>CLASS ACTION</u>
               Plaintiff,   :
                                       :   CLASS ACTION COMPLAINT
   vs.                            :
                                       :
MORGAN STANLEY, MORGAN STANLEY  :
SMITH BARNEY LLC, and E*TRADE    :
SECURITIES LLC,                 :
                                       :
           Defendants.   :   <u>DEMAND FOR JURY TRIAL</u>
                                       :
———————————————————— x

By and through his undersigned counsel, James Bertonis ("Plaintiff") brings this class action against defendants Morgan Stanley, Morgan Stanley Smith Barney LLC ("MSSB"), and E*TRADE Securities LLC ("E*TRADE") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by Morgan Stanley with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to their Sweep Programs (defined below). Under the Sweep Programs, Defendants swept idle customer cash into interest-bearing accounts at banks selected by and affiliated with Defendants.

2.      The cash sweep accounts were highly lucrative for Defendants and their banks but paid unreasonably low interest rates to customers. As such, Defendants used the Sweep Programs to generate massive revenue for themselves at the expense of their customers.

3.      Defendants' use of the Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers breached their fiduciary duties and contractual obligations and violated several state and federal laws including the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute") and the Investment Advisers Act of 1940 ("Advisers Act").

4.    Accordingly, Defendants' Sweep Programs have begun to attract scrutiny from federal and state regulators. In August 2024, for example, Morgan Stanley announced that it was under investigation by the SEC for potential violations of the federal statute governing the conduct of investment advisors concerning the Sweep Programs.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c), 28 U.S.C. §1331, and 15 U.S.C. §80b-14 because Plaintiff brings claims arising under the RICO Statute, 18 U.S.C. §1962, and the Advisers Act, 15 U.S.C. §80b-1-80b-21.

6.    This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants had offices in, did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of New York through the promotion, sale, marketing, distribution, and operation of their products and services.

7.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants transacted business and had offices in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

8.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails and interstate telephone communications.

## PARTIES

**Plaintiff**

9.    Plaintiff James Bertonis is a citizen of California.  During the relevant time period, Plaintiff held an individual brokerage account and a Roth IRA account with E*TRADE. Uninvested cash Plaintiff held in these accounts was swept into the banks that Defendants selected in their discretion at the unreasonably low interest rates alleged herein.

**Defendants**

10.    Defendant Morgan Stanley is a Delaware corporation headquartered at 1585 Broadway, New York, New York 10036.  Morgan Stanley is a financial services company that conducts business throughout the United States, with assets totaling $1.2 trillion, loans totaling approximately $147.4 billion, and approximately 80,000 employees.  Morgan Stanley is the parent company and control person of E*TRADE and MSSB.

11.    Defendant Morgan Stanley Smith Barney LLC is a Delaware limited liability company headquartered at 1585 Broadway, New York, New York 10036.  MSSB is a broker-dealer and a Registered Investment Advisor that offers brokerage and investment advisory services to its nationwide client base.  During the relevant time period, MSSB acted as agent for the establishment, maintenance, and operation of one of Defendants' cash sweep programs, called the "Bank Deposit Program."  MSSB is a wholly owned subsidiary of, and controlled by, Morgan Stanley.

12.    Defendant E*TRADE Securities LLC, a Delaware limited liability company, is an online brokerage platform that provides direct trading and investing services to customers. E*TRADE is a subsidiary of E*TRADE Financial Corporation, headquartered at 671 North Glebe Road, Arlington, Virginia 22203, and maintains offices at 200 Hudson Street, Jersey City, New Jersey 07302.  E*TRADE was a broker-dealer and a Registered Investment Advisor that acted as

its customers' agent for the establishment, maintenance, and operation of Defendants' cash sweep programs including the Extended Sweep Deposit Account Program ("ESDA Program") and the Retirement Sweep Deposit Account Program ("RSDA Program" and, together with the Bank Deposit Program and ESDA Program, "Sweep Programs").  Morgan Stanley acquired E*TRADE and E*TRADE Financial Corporation on October 2, 2020 ("E*TRADE Acquisition").  As a result of the E*TRADE Acquisition, E*TRADE and E*TRADE Financial Corporation are wholly owned subsidiaries of, and controlled by, Morgan Stanley.

## SUBSTANTIVE ALLEGATIONS

**Background on Defendants' Sweep Programs**

13.    Morgan Stanley is one of the largest financial services firms in the country.  During the relevant time period, Morgan Stanley's wholly owned subsidiaries, MSSB and E*TRADE, offered brokerage and investment advisory services to customers nationwide.  These services included automatic cash sweep programs offered through E*TRADE (the ESDA Program and the RSDA Program) and MSSB (the Bank Deposit Program).

14.    Defendants provided the ESDA Program and RSDA Program to E*TRADE account holders from the date of the E*TRADE Acquisition on October 2, 2020, until approximately October 2023.  The ESDA Program was for non-retirement account holders and the RSDA Program was for retirement account holders.  The terms and conditions of the ESDA Program were set forth in the ESDA Program Customer Agreement[1] ("ESDA Program

_____

[1]    E*TRADE    Financial,    *ESDA    Program    Customer    Agreement*, https://web.archive.org/web/20190228232039/https://us.etrade.com/e/t/welcome/help?id=12090 26000 (Feb. 28, 2019).

Agreement") and the E*TRADE Customer Agreement[2] (collectively, "ESDA Program Documents"), which were posted on the public website of E*TRADE. The ESDA Program Documents were governed by the laws of the State of New York.

15.    Under the ESDA Program, E*TRADE automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("ESDA Program Accounts") with a network of bank partners selected by Defendants ("ESDA Sweep Banks" or "ESDA Program Banks"), including at least two banks affiliated with Morgan Stanley, Morgan Stanley Bank, N.A. and Morgan Stanley Private Bank, National Association ("Morgan Stanley Sweep Banks").[3] Funds in the ESDA Program Accounts were insured by the Federal Deposit Insurance Corporation ("FDIC").[4]

16.    The ESDA Program Documents provided that E*TRADE would act as an agent for customers in the ESDA Program, stating that the "ESDA is being provided to [the customer] by [E*TRADE] as [the customer's] agent"; the customer "understand[s] that [E*TRADE] as [the customer's] agent may agree to the deposit terms and conditions at each [ESDA] Program Bank where [the customer's] ESDA Program deposits are held, and such additional terms and conditions will be binding on [the customer]"; and "[t]ransfers of [the customer's] ESDA cash balances from the [ESDA] Program Banks back to [the customer's] [E*TRADE] brokerage account may be made only by [E*TRADE] as [the customer's] agent or its service provider as subagent."[5]

---

[2]    E*TRADE    from    Morgan    Stanley,    *E*TRADE    Customer    Agreement*, https://web.archive.org/web/20221203033803/https://us.etrade.com/l/f/customer-agreement?vanity=custagree (Sept. 1, 2022).

[3]    E*TRADE Financial, *ESDA Program Customer Agreement*, *supra* note 1.

[4]    *Id.*

[5]    *Id.*;

17.    The sweep interest on deposits in the ESDA Program was paid "at rates determined [by E*TRADE] pursuant to its agreements with the [ESDA] Program Banks" and "subject to change at any time."[6]

18.    The terms and conditions of the RSDA Program were set forth in the E*TRADE Financial RSDA Program Customer Agreement[7] ("RSDA Program Agreement") and the E*TRADE Customer Agreement[8] (collectively, "RSDA Program Documents"), which were posted on the public website of E*TRADE.  Similar to the Bank Deposit Program and the ESDA Program, under the RSDA Program, E*TRADE automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("RSDA Program Accounts") with a network of bank partners selected by Defendants ("RSDA Sweep Banks" or "RSDA Program Banks"), including the Morgan Stanley Sweep Banks.  Funds in the RSDA Program Accounts were insured by the FDIC.

19.    The RSDA Program Documents provided that E*TRADE would act as an agent for customers in the RSDA Program, stating that the "RSDA is being provided to [the customer] by [E*TRADE] as [the customer's] agent"; the customer "understand[s] that [E*TRADE] as [the customer's] agent may agree to the deposit terms and conditions at each [RSDA] Program Bank where [the customer's] RSDA Program deposits are held and that such additional terms and conditions will be binding on [the customer]"; and "[t]ransfers of [the customer's] RSDA cash balances from the [RSDA] Program Banks back to [the customer's] [E*TRADE brokerage]

---

[6]    *Id.*

[7]    E*TRADE, *E*TRADE Financial RSDA Program Customer Agreement*, https://web.archive.org/web/20210128183929/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (June 2, 2022).

[8]    E*TRADE from Morgan Stanley, *E*TRADE Customer Agreement*, *supra* note 2.

Account may be made only by [E*TRADE] as [the customer's] agent or its service provider as subagent."[9]

20.    The sweep interest on deposits in the RSDA Program was paid "at rates determined [by E*TRADE] pursuant to agreements . . . with the [RSDA] Program Banks" and "subject to change at any time."[10]

21.    By approximately October 2023, Morgan Stanley had ceased offering the ESDA Program and RSDA Program and converted all participants in those programs to the Bank Deposit Program operated by MSSB.  The terms and conditions of the Bank Deposit Program were set forth in the E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts[11] ("Bank Deposit Program Agreement") and the Bank Deposit Program Disclosure Statement[12] (collectively, "Bank Deposit Program Documents" and, together with the ESDA Program Documents and RSDA Program Documents, "Program Documents"), which were posted on the public websites of E*TRADE and Morgan Stanley.  The Bank Deposit Program Documents were governed by the laws of the State of New York.

---

[9]    E*TRADE, *E*TRADE Financial RSDA Program Customer* Agreement, *supra* note 7.

[10]    *Id*.

[11]    E*TRADE from Morgan Stanley, *E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts*, https://us.etrade.com/l/f/agreement-library/client-agreement (Dec. 16, 2024).

[12]    Morgan    Stanley,    *Bank    Deposit    Program    Disclosure    Statement*, https://www.morganstanley.com/content/dam/msdotcom/en/wealth-disclosures/pdfs/BDP_disclosure.pdf (Nov. 2024).

22.     The Bank Deposit Program included cash swept from investment advisory accounts held by E*TRADE customers, who were, thus, subject to the terms and conditions of the Bank Deposit Program Documents.[13]

23.     Under the Bank Deposit Program, MSSB automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("Bank Deposit Program Accounts") with a network of bank partners selected by Defendants ("Bank Deposit Program Sweep Banks" and, together with the ESDA Sweep Banks and RSDA Sweep Banks, "Sweep Banks"), including Defendants' affiliated Morgan Stanley Sweep Banks.[14]  Funds in Bank Deposit Program Accounts were insured by the FDIC.[15]

24.     The Bank Deposit Program Documents provided that MSSB would act as an agent for customers in the Bank Deposit Program, stating, "[MSSB] as your agent will generally deposit cash in your Deposit Accounts at a Sweep Bank on the first business day after the cash is received in your Account" and "[MSSB] will remain the agent and custodian for all your deposits in the [Bank Deposit] Program."[16]

25.     The sweep interest rates paid to customers were set by MSSB and the Bank Deposit Program Sweep Banks and could be changed "in their sole discretion and without prior notice to [customers]."[17]

---

[13]     Morgan Stanley Smith Barney LLC, *Core Portfolios Investment Advisory Agreement*, https://content.etrade.com/etrade/estation/pdf/mscoreagreement.pdf (Feb. 2025) at 3-4.

[14]     Morgan Stanley, *Bank Deposit Program Disclosure Statement*, *supra* note 12 at 2.

[15]     *Id.*

[16]     *Id.* at 2, 6-7.

[17]     *Id*. at 6.

26.    In addition to migrating E*TRADE customers to the Bank Deposit Program, Morgan Stanley shifted E*TRADE's IRAs to the Morgan Stanley Individual Retirement Plan[18] and E*TRADE's Roth IRAs to the Morgan Stanley Roth IRA document[19] (collectively, "Morgan Stanley Retirement Account Documents" and, together with the Bank Deposit Program Documents, the ESDA Program Documents, and the RSDA Program Documents, the "Program Documents").  The Morgan Stanley Retirement Account Documents were governed by the laws of the State of New York and incorporated the terms of the Bank Deposit Program Disclosure Statement.

**Defendants Reaped Significant Benefits from Their Sweep Programs to the Detriment of Customers, Who Were Paid Unreasonably Low Interest Rates**

27.    The Sweep Programs provided highly lucrative financial benefits to Defendants and the Sweep Banks, including Defendants' affiliated Morgan Stanley Sweep Banks.  Under the Bank Deposit Program, the Bank Deposit Program Sweep Banks used customer deposits to fund current and new businesses, including lending activities and investments, and paid MSSB an annual account-based fee for use of the deposits.

28.    MSSB admitted that its "ability to influence the interest rate on [customers'] Deposit Accounts presents a ***conflict of interest***" because "[t]he lower the amount of interest paid to customers, the greater is the 'spread' earned by the Morgan Stanley Sweep Banks on deposits through the [Bank Deposit] Program."[20]  By increasing the spread through lower interest payments

---

[18]  E*TRADE from Morgan Stanley, *Morgan Stanley Individual Retirement Plan*, https://us.etrade.com/l/f/agreement-library/ira-plan-documents (Oct. 2012).

[19]  E*TRADE from Morgan Stanley, *Morgan Stanley Roth IRA*, https://us.etrade.com/l/f/agreement-library/roth-ira-plan-documents (Oct. 2012).

[20]  Morgan Stanley, *Bank Deposit Program Disclosure Statement*, *supra* note 12 at 6, 10.  The SEC also recognized that "cash sweep programs" are a "common source[] of conflicts of interest." U.S. Securities and Exchange Commission, Staff Bulletin:  Standards of Conduct for Broker-

to customers, Defendants and the Bank Deposit Program Sweep Banks were able to increase their profits from the Bank Deposit Program.

29.    Similarly, the ESDA Program Documents stated that E*TRADE "earn[s] fees based on the amount of money in the ESDA Program" and will "earn a higher fee if [the customer] participate[s] in the ESDA Program than if [the customer] invest[s] in other cash sweep products."[21]

30.    Under the ESDA Program, the ESDA Sweep Banks "may use the cash balances in its ESDA Program deposit accounts to fund certain lending and investment activity.  As with other banks, the profitability of [the ESDA Sweep Banks] is determined in large part by the difference, or 'spread,' between (i) the interest paid and other fees and costs incurred by it on the ESDA Program deposit accounts and (ii) the interest or other income earned on its loans, investments, and other assets."[22]  This provides "a stable source of investable and lendable funds for [the ESDA Sweep Banks], which may be at a lower cost than other funding sources."[23]

31.    The RSDA Program Documents similarly stated that E*TRADE "earn[s] fees based on the amount of money in the RSDA Program" and "may earn a higher fee if [the customer] participate[s] in the RSDA Program than if [the customer] invest[s] in other cash sweep products."[24]

---

Dealers    and    Investment    Advisers    Conflicts    of    Interest    (Sept.    9,    2024), https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

[21]   E*TRADE Financial, *ESDA Program Customer Agreement*, *supra* note 1.

[22]   *Id.*

[23]   *Id.*

[24]   E*TRADE, *E*TRADE Financial RSDA Program Customer Agreement*, *supra* note 7.

32.     In addition, under the RSDA Program, the RSDA Sweep Banks "may use the cash balances in RSDA Program deposit accounts to fund certain lending and investment activity."[25] "As with other banks, the profitability of the [RSDA] Program Banks is determined in large part by the difference, or 'spread,' between (1) the interest paid and other fees and costs incurred by it on the RSDA Program deposit accounts; and (2) the interest or other income earned on its loans, investments, and other assets."[26] As such, "RSDA Program deposit accounts at E*TRADE Bank and E*TRADE Savings Bank provide a stable source of investable and lendable funds for the [RSDA] Program Banks, which may be at a lower cost than other funding sources."[27]

33.     Due to these adverse financial incentives, Defendants failed to negotiate and secure reasonable sweep interest rates for customers in the Sweep Programs. As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

34.     The United States Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[28]

35.     Similarly, the United States Internal Revenue Service defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the

---

[25]   *Id.*

[26]   *Id.*

[27]   *Id.*

[28]   Grant of Individual Exemptions; Deutsche Bank AG, 68 Fed. Reg. 34646 (June 10, 2003).

indebtedness arose, in independent transactions with or between unrelated parties under similar

circumstances."[29]  Thus, an interest rate is reasonable if it is based on a fair market valuation.

36.    In contrast, the Sweep Programs paid miniscule, below-market interest rates

throughout the relevant time period, currently ranging from a miniscule 0.01% to 0.15% depending

on the amount deposited by a customer.[30]  These rates were ***significantly*** below several objective

benchmarks of reasonableness:

- **Competitors' Deposit Accounts**.  Defendants' sweep interest rates were far below
  fair market value, as demonstrated by the rates paid by their competitors.
  According to the FDIC, the national rate of interest paid by money market deposit
  products offered by insured depository institutions and credit unions currently
  averages 0.66%.[31]  Moreover, competitors offering FDIC-insured sweep accounts
  similar to those in the Sweep Programs pay even higher rates.  For example,
  competitor Moomoo's rate currently is 4.1%,[32] Webull's rate is 3.75%,[33]

---

[29]  26 C.F.R. §1.482-2(a)(2).

[30]  E*TRADE from Morgan Stanley, *Rate Monitor*, https://us.etrade.com/l/options-uninvested-cash/sweep-rates (last visited Jan. 13, 2025).

[31]  Federal Deposit Insurance Corporation, *National Rates and Rate Caps* (Feb. 18, 2025), https://www.fdic.gov/national-rates-and-rate-caps.  The FDIC defines the national rate of interest as "the average of rates paid by all insured depository institutions and credit unions for which data is available, with rates weighted by each institution's share of domestic deposits."  *Id.*  Informa Research Services, a company that specializes in compiling business data, also found that FDIC-insured United States banks consistently pay significantly higher interest rates than Defendants on deposit accounts, including average rates ranging from 0.19% to 0.36% from August 2017 through March 2019.

[32]  Moomoo Financial Inc., *Boost your uninvested cash with 4.1% APY*, https://www.moomoo.com/us/invest/cashsweep (last visited Feb. 24, 2025).

[33]  Webull, *Webull High-Yield Case Management*, https://www.webull.com/cash-management (last visited Feb. 24, 2025).

Vanguard's rate is 3.65%,[34] and Robert W. Baird's rate is between 1.45% and 2.89%.[35]

- **<u>Other Interest-Bearing Accounts Offered by Defendants</u>**.  Further, the sweep interest rates paid by the Sweep Programs were far lower than the interest rates paid by other products offered by Defendants outside of the Sweep Programs.  For example, E*TRADE's FDIC-insured premium savings account currently pays 3.92% and E*TRADE's FDIC-insured max rate checking account currently pays 2.96%.[36]

- **<u>Federal Funds Rate</u>**.  The sweep interest rates in the Sweep Programs were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[37]

- **<u>Treasury Bill Rates</u>**.  The sweep interest rates in the Sweep Programs were far below U.S. Treasury bill rates, including the three-month and one-year rates currently at 4.21% and 4.02%, respectively.[38]

- **<u>Repurchase Rate</u>**.  The sweep interest rates in the Sweep Programs were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[39]

---

[34]  Vanguard, *Earn 3.65% APY with the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited Feb. 24, 2025).

[35]  Baird, *Cash Sweep Program*, https://www.rwbaird.com/cashsweeps/ (last visited Feb. 24, 2025).

[36]  E*TRADE from Morgan Stanley, *Rate Monitor*, *supra* note 30; E*TRADE from Morgan Stanley, *Banking Rates and Fees*, https://us.etrade.com/bank/bank-rates#tab_5 (last visited Feb. 24, 2025).

[37]  Federal Reserve, *Economy at a Glance – Policy Rate* (Dec. 19, 2024), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[38]  Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (Feb. 21, 2025), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (Feb. 21, 2025), https://fred.stlouisfed.org/series/DTB1YR.

[39]  Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations* (Feb. 21, 2025), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

37.     These benchmarks individually and collectively demonstrated that Defendants' sweep interest rates were unreasonable.  As a result, Plaintiff and the Class (defined below) suffered damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to Their Sweep Programs**

38.     Under the Program Documents, E*TRADE and MSSB agreed to act as their customers' agents in connection with the Sweep Programs.  As agents, E*TRADE and MSSB exercised discretion and control over cash deposited into the Sweep Programs, selected the Sweep Banks, coordinated with the Sweep Banks to set interest rates, and swept customers' cash into the Sweep Banks.

39.     E*TRADE and MSSB, as agents under the Program Documents, were contractually obligated to act in their customers' best interests in seeking and negotiating reasonable interest rates under the Sweep Programs.  In other words, reasonableness was implicit in the Program Documents and governed the sweep interest rates paid to customers in the Sweep Programs. However, E*TRADE and MSSB failed to act in their customers' best interests because, as discussed above, the sweep interest rates were unreasonable compared to compared to several objective benchmarks.

40.     Defendants also violated their contractual duties to provide reasonable rates of return on their customers' retirement account balances pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA"), which were incorporated into Program Documents governing retirement accounts.  The RSDA Program Agreement, for example,  contained a statement that IRA account customers "authorize such RSDA Program deposits and understand that each Program Bank will pay a ***reasonable*** rate of

- 14 -

interest, as contemplated by ERISA Section 408(b)(4) and the regulations under [IRC] Section 4975(d)(4)." [40]

41.     The Morgan Stanley Individual Retirement Plan stated that "[t]he Participant authorizes the deposit or investment of cash balances in the [IRA] Account in . . . deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a **reasonable** rate of interest."[41]   The Morgan Stanley Individual Retirement Plan also stated that neither the IRA account participant nor custodian (defined as MSSB or a Morgan Stanley affiliate) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Account."[42]

42.     Similarly, the Morgan Stanley Roth IRA document stated that "[t]he Participant authorizes the deposit or investment of cash balances in the Roth IRA in . . . deposit accounts with Morgan Stanley Bank, N.A. and or any other banking affiliate of the Custodian that bear a **reasonable** rate of interest."[43]   The Morgan Stanley Roth IRA document also stated that neither the Roth IRA account participant nor custodian (defined as MSSB or an affiliate of MSSB) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Roth IRA."[44]

43.     Section 4975 of the IRC states that "prohibited transaction[s]" involving a retirement plan include any direct or indirect "transfer to, or use by or for the benefit of, a

---

[40]   E*TRADE, *E*TRADE Financial RSDA Program Customer Agreement*, *supra* note 7.

[41]   E*TRADE from Morgan Stanley, *Morgan Stanley Individual Retirement Plan*, *supra* note 18.

[42]   *Id.*

[43]   E*TRADE from Morgan Stanley, *Morgan Stanley Roth IRA*, *supra* note 19.

[44]   *Id.*

disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan."[45]  A "disqualified person" under Section 4975 of the IRC includes a "fiduciary" and "a person providing services to the [retirement] plan."[46]

44.    Therefore, E*TRADE and MSSB were "disqualified person[s]" under Section 4975 of the IRC because they were fiduciaries and service providers of retirement account customers in connection with the Sweep Programs.  Because they were disqualified persons, cash sweeps from retirement accounts to the Sweep Banks, for the benefit of Defendants and the Sweep Banks, were "prohibited transactions" under Section 4975 of the IRC.

45.    The IRC provides limited "exemptions" to prohibited transactions under Section 4975, including "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."[47]  However, cash sweeps under the Sweep

---

[45]  26 U.S.C. §4975(c)(1)(D)-(F).

[46]  26 U.S.C. §4975(e)(2)(A)-(B); *see also* Department of the Treasury, Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, Publication 590-B (Mar. 12, 2024) at 22, https://www.irs.gov/pub/irs-pdf/p590b.pdf (stating that "disqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets," and that "prohibited transactions" are "any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person").

[47]  26 U.S.C. §4975(d)(4).  Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  26 C.F.R. §54.4975-6(b)(1), (3).

Programs were not exempt because the Sweep Banks did not pay reasonable sweep interest rates, as discussed above.

46.     Similarly, Section 408 of ERISA exempts interested party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate." [48]  This exemption did not apply because the Sweep Banks did not pay reasonable sweep interest rates.

47.     Thus, Defendants' cash sweeps from retirement accounts violated the IRC, ERISA, and the contractual provisions of the Program Documents that incorporated the IRC and ERISA.

48.     In addition to their contractual obligations, as investment advisors, E*TRADE and MSSB owed fiduciary duties to their clients under the Advisers Act.[49]  In particular, E*TRADE and MSSB were obligated to "serve the best interest of [their] client and not subordinate [their] client's interest to [their] own" and were not permitted to "place [their] own interests ahead of the interests of [their] client."[50]  Consistent with these fiduciary duties, the Bank Deposit Program Documents stated that MSSB was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client."[51]

49.     As their customers' agents in connection with the Sweep Programs, E*TRADE and MSSB owed similar fiduciary duties under common law and under Regulation Best Interest, which

---

[48]   29 U.S.C. §1108(b)(4).

[49]   *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

[50]   *Id.*

[51]   *Id.*

required them to act in their retail customers' best interests and prohibited them from placing their own interests ahead of their retail customers' interests.[52]

50. However, as discussed above, E*TRADE and MSSB violated these fiduciary duties under the Advisers Act, Regulation Best Interest, and common law by failing to act in their customers' best interests, and by placing their own interests ahead of their customers' interests, when they enriched Defendants and the Sweep Banks by providing customers in the Sweep Programs with unreasonably low interest rates that were well below several objective benchmarks discussed above.

51. These allegations are strongly supported by the fact that the Sweep Programs are under scrutiny by the SEC and a state securities regulator.  In August 2024, Morgan Stanley disclosed that, "[s]ince April 2024, the firm has been engaged with and is responding to requests for information from the Enforcement Division of the SEC regarding advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940."[53]  In November 2024, Morgan Stanley made a similar disclosure regarding its ongoing engagement with the Enforcement Division of the SEC and added that it also "has been engaged with and is responding to requests for information from . . . a state securities regulator regarding brokerage account cash balances swept to the affiliate bank deposit program."[54]

---

[52]  *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

[53]  Morgan Stanley, Quarterly Report (Form 10-Q) (Aug. 5, 2024), at 68, https://www.sec.gov/Archives/edgar/data/895421/000089542124000403/ms-20240630.htm.

[54]  Morgan Stanley, Quarterly Report (Form 10-Q) (Nov. 4, 2024), at 69, https://www.sec.gov/ix?doc=/Archives/edgar/data/895421/000089542124000491/ms-20240930.htm.

**Defendants Made Material Misrepresentations and Omissions Regarding Their Sweep Programs**

52.    In the Program Documents, Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers in order to increase their financial benefits.

53.    The Bank Deposit Program Documents also misleadingly stated: "The interest rate is generally based on a variety of factors, including, but not limited to, current market conditions and competitive interest rates."[55]   This statement was misleading and omitted material facts because, in reality, the Bank Deposit Program always paid below-market and unreasonably low interest rates rather than "market" and "competitive" interest rates.

54.    In the Bank Deposit Program Documents, Defendants made the additional misleading statements that "[t]he interest rates applicable to your Deposit Accounts at the [Bank Deposit Program] Sweep Banks ***may be higher or lower*** than the interest rates available on other deposit accounts offered by a [Bank Deposit Program] Sweep Bank or on deposit accounts offered by other depository institutions" and the Bank Deposit Program Sweep Banks "***can and sometimes do*** pay higher interest rates on some deposits they receive directly than they pay on deposits received through the [Bank Deposit] Program."[56]   These statements were misleading and omitted material facts because, in reality, the Bank Deposit Program interest rates were ***always*** significantly below market alternatives.

---

[55]   Morgan Stanley, *Bank Deposit Program Disclosure Statement*, *supra* note 12.

[56]   *Id.*

55.     Defendants made similar misstatements and omissions in the ESDA Program Documents: "The interest rate I earn on my ESDA Program deposits *may be higher or lower* than the rates available to depositors making non-ESDA Program deposits with [ESDA] Program Banks directly, through other types of accounts at [E*TRADE], with other depository institutions in comparable accounts, or with alternative short-term investment options."[57]  These statements were misleading and omitted material facts because, in reality, the ESDA Program interest rates were *always* significantly below market alternatives.

56.     With respect to IRA accounts, the RSDA Program Agreement misleadingly stated that IRA account customers "authorize such RSDA Program deposits and understand that each Program Bank will pay a *reasonable* rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under [IRC] Section 4975(d)(4)."[58]

57.     The Morgan Stanley Individual Retirement Plan misleadingly stated that "[t]he Participant authorizes the deposit or investment of cash balances in the [IRA] Account in . . . deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a *reasonable* rate of interest."[59]  Further, the Morgan Stanley Individual Retirement Plan misleadingly stated that neither the IRA account participant nor custodian (defined as MSSB or a Morgan Stanley affiliate) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Account."[60]

---

[57]   E*TRADE Financial, *ESDA Program Customer Agreement*, *supra* note 1.

[58]   E*TRADE, *E*TRADE Financial RSDA Program Customer Agreement*, *supra* note 7.

[59]   E*TRADE from Morgan Stanley, *Morgan Stanley Individual Retirement Plan*, *supra* note 18.

[60]   *Id.*

58.     Similarly, the Morgan Stanley Roth IRA document misleadingly stated that "[t]he Participant authorizes the deposit or investment of cash balances in the Roth IRA in . . . deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a ***reasonable*** rate of interest."[61]  The Morgan Stanley Roth IRA document also misleadingly stated that neither the Roth IRA account participant nor custodian (defined as MSSB or an affiliate of MSSB) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Roth IRA."[62]

59.     Moreover, Defendants' statements about potentially ***lower*** interest rates did not excuse their contractual and fiduciary obligations to pay ***reasonable*** interest rates, as described above.  These statements must be construed harmoniously with Defendants' contractual and fiduciary obligations.

**Defendants Violated the RICO Statute**

60.     Defendants violated the RICO Statute through their implementation of the Sweep Programs.

61.     MSSB, E*TRADE, and the Sweep Banks were an "enterprise" within the meaning of the RICO Statute.  Through MSSB, E*TRADE, and the Sweep Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as a scheme to defraud customers, including Plaintiff and the Class (defined below).  Defendants used the Sweep Programs to benefit and enrich themselves and the Sweep Banks through, among other things, paying unreasonably low interest rates to customers on money deposited into the Sweep Programs and making false and misleading statements and omissions relating to such interest rates.

---

[61]   E*TRADE from Morgan Stanley, *Morgan Stanley Roth IRA*, *supra* note 19.

[62]   *Id.*

62.     The Sweep Programs involved commercial activities across state lines, including Defendants' distribution of the Program Documents to customers, and Defendants' receipt and transfer of money deposited by customers.

63.     Through the Sweep Programs, Defendants conducted and participated in a pattern of racketeering activity within the meaning of the RICO Statute ("Racketeering Acts"). Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on Defendants' fraudulent use of interstate mail and wire communications. Defendants orchestrated a scheme to intentionally defraud customers by coordinating with the Sweep Banks to pay unreasonably low interest rates to customers in the Sweep Programs and by concealing the scheme through false and misleading Program Documents posted on E*TRADE's public website and distributed to customers throughout the country.

64.     The Racketeering Acts were related in that they were taken in furtherance of Defendants' Sweep Programs scheme. The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Sweep Programs.

65.     Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute. Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including posting the materially false and misleading Program Documents on the public websites of E*TRADE and Morgan Stanley and distributing them to customers throughout the country.

66.     As customers of the Sweep Programs, Plaintiff and the Class (defined below) were damaged by Defendants' Racketeering Acts due to Defendants' payment of unreasonably low interest rates on the money customers deposited into the Sweep Programs.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action against Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all E*TRADE customers who had cash deposits or balances in the Sweep Programs from the time of the E*TRADE Acquisition (October 2, 2020) through present ("Class").  Excluded from the Class are Defendants, officers and directors of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

68.     The Class members are so numerous that their individual joinder is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, and are geographically dispersed, because Morgan Stanley oversees approximately $7 trillion in client assets worldwide.

69.     Plaintiff's claims are typical of Class members' claims because Plaintiff's cash deposits were subject to the Sweep Programs, and, therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful conduct by Defendants alleged herein.

70.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in complex class action litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

71.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class

members who were not parties to the adjudications or would substantially impair or impede the ability of such Class members to protect their interests.

72.    Because Defendants act or refuse to act on grounds that apply generally to the Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

73.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

74.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants act on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the laws as alleged herein;

(b)    whether MSSB and E*TRADE owed fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(c)    whether MSSB and E*TRADE breached their fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(d)    whether MSSB and E*TRADE breached their contractual obligations to Plaintiff and members of the Class in connection with the Sweep Programs;

(e)    whether Defendants violated the Advisers Act;

(f)    whether Defendants violated the RICO Statute;

(g)    whether Defendants made material misrepresentations and/or omissions in connection with the Sweep Programs;

(h)    whether Defendants were unjustly enriched by their wrongful conduct;

(i)    whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(j)    whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### AGAINST ALL DEFENDANTS

75.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

76.    During the relevant time period, MSSB and E*TRADE were the agents of, and investment advisors to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  Morgan Stanley owned and controlled MSSB and E*TRADE.

77.    MSSB and E*TRADE owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

78.    MSSB and E*TRADE violated their duties to act in the best interests of Plaintiff and the Class by using the Sweep Programs to enrich themselves, Morgan Stanley, and the Sweep Banks at the expense of customers who were paid unreasonably low interest rates, as described above.

79.    MSSB and E*TRADE also violated their duties to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Program Documents, as described above.

- 25 -

80.     Further, MSSB and E*TRADE violated their duties to act with reasonable care to verify the truthfulness of the information set forth in the Sweep Programs, which were materially misleading and omitted material facts for the reasons described above.

81.     As a direct and proximate result of MSSB's and E*TRADE's breaches of fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

## COUNT II

### VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940
### AGAINST ALL DEFENDANTS

82.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

83.     During the relevant time period, MSSB and E*TRADE were registered as investment advisers under the Advisers Act.  Morgan Stanley owned and controlled MSSB and E*TRADE.

84.     For the reasons alleged herein, MSSB and E*TRADE violated Section 206 of the Advisers Act in connection with their operation of the Sweep Programs by failing to serve the best interests of their clients and by placing their own interests ahead of their clients' interests.  *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019).

85.     The Program Documents should be deemed void pursuant to Section 215(b) of the Advisers Act, which provides that every

> contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of

- 26 -

which the making or performance of such contract was in violation of any such provision.

86.    Accordingly, Plaintiff seeks rescission of the Program Documents and restitution of the consideration given pursuant to their purported terms.

## COUNT III

## BREACH OF CONTRACT
## AGAINST ALL DEFENDANTS

87.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

88.    Plaintiff and Class members were parties to the Program Documents with MSSB and/or E*TRADE.  The Program Documents set forth the contractual terms and conditions of the Sweep Programs.  Morgan Stanley owned and controlled MSSB and E*TRADE.

89.    Pursuant to the Program Documents, MSSB and E*TRADE were contractually obligated to act as agents on behalf of Plaintiff and the Class, and, thus, were contractually obligated to act in Plaintiff's and the Class' best interests in seeking and negotiating reasonable sweep interest rates under the Sweep Programs.

90.    MSSB and E*TRADE breached their contractual obligations by failing to provide Plaintiff and the Class with reasonable interest rates on their deposits in the Sweep Programs. Rather, the sweep interest rates provided by MSSB and E*TRADE were below market and unreasonably low.  As such, MSSB and E*TRADE denied Plaintiff and the Class the full benefit of their bargain under the Program Documents.

91.    As a direct and proximate result of MSSB's and E*TRADE's breaches of contract, Plaintiff and the Class sustained damages.

## COUNT IV

## BREACH OF IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING
## AGAINST ALL DEFENDANTS

92.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

93.     Plaintiff and Class members were parties to the Program Documents with MSSB and/or E*TRADE.  The Program Documents set forth the contractual terms and conditions of the Sweep Programs.  Morgan Stanley owned and controlled MSSB and E*TRADE.

94.     Implicit in the Program Documents were duties of good faith and fair dealing.

95.     MSSB and E*TRADE breached their duties of good faith and fair dealing by failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs.  Rather, the interest rates provided by MSSB and E*TRADE were below market and unreasonably low.  As such, MSSB and E*TRADE denied Plaintiff and the Class the full benefit of their bargain under the Program Documents.

96.     As a direct and proximate result of MSSB's and E*TRADE's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT V

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
## ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d),
## AGAINST ALL DEFENDANTS

97.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

98.     This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provides in relevant part:

> (c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

99.     At all relevant times, Morgan Stanley was a "person" because it was capable of holding a legal or beneficial interest in property.

100.     During the relevant time period, MSSB, E*TRADE, and the Sweep Banks were an enterprise engaged in interstate commerce.  Through MSSB, E*TRADE, and the Sweep Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as schemes to defraud investors.  Defendants used the Sweep Programs to enrich themselves and the Sweep Banks by paying unreasonably low interest rates to customers of the Sweep Programs.

101.     Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Sweep Programs.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Sweep Programs over a multi-year period, constituted a "pattern of racketeering activity."  The Racketeering Acts were made possible by the regular, repeated, and continuous use of the employees, facilities, and services of MSSB and E*TRADE.

102.     Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a)     **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending and receiving materials via United States mail and commercial interstate carriers, including the Program Documents, for the purpose of conducting the fraudulent Sweep Programs scheme through MSSB, E*TRADE, and the Sweep Banks.  As described above, the Program Documents contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

(b)    **Wire Fraud**: Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Programs scheme through MSSB, E*TRADE, and the Sweep Banks.  The writings included the Program Documents, which were posted on E*TRADE's and Morgan Stanley's public websites.  As described above, the Program Documents contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

103.    Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including mailing and transmitting the Program Documents to customers.

104.    Plaintiff and the Class suffered damages by reason of Defendants' payment of unreasonably low interest rates on their deposits in the Sweep Programs, in violation of 18 U.S.C. §1962(c)-(d).

105.    Plaintiff's and the Class' injuries were directly and proximately caused by Defendants' racketeering activity.

**COUNT VI**

**NEGLIGENCE**
**AGAINST ALL DEFENDANTS**

106.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

107.    During the relevant time period, MSSB and E*TRADE were the agents of, and investment advisors to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  E*TRADE also facilitated the Sweep Programs by accepting payments from customers

through its online investment platform, which are swept into the Sweep Programs.  Morgan Stanley

owned and controlled MSSB and E*TRADE.

108.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in

connection with their cash sweep balances deposited and maintained in the Sweep Programs.

109.    Defendants' conduct with respect to the Sweep Programs, as described above, was

negligent.  By failing to provide Plaintiff and the Class with fair and reasonable sweep interest

rates on their cash sweep balances in the Sweep Programs, Defendants breached their duty to act

with reasonable care.

110.    Defendants' negligence directly and proximately caused harm to Plaintiff and the

Class.

## COUNT VII

### NEGLIGENT MISREPRESENTATIONS AND OMISSIONS
### AGAINST ALL DEFENDANTS

111.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

112.    During the relevant time period, MSSB and E*TRADE were the agents of, and

investment advisors to, customers enrolled in the Sweep Programs, including Plaintiff and the

Class.  E*TRADE also facilitated the Sweep Programs by accepting payments from customers

through its online investment platform, which are swept into the Sweep Programs.  Morgan Stanley

owned and controlled MSSB and E*TRADE.

113.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in

connection with their cash sweep balances deposited and maintained in the Sweep Programs.

114.    Defendants negligently made material misrepresentations and omissions in the

Program Documents, as described above, which were posted on E*TRADE's and Morgan

Stanley's public websites.

115.    Plaintiff and the proposed Class justifiably relied on Defendants' Program Documents and accordingly deposited and maintained cash balances in the Sweep Programs to their detriment.

116.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Class.

## COUNT VIII

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349
### AGAINST ALL DEFENDANTS

117.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

118.    Defendants' acts and practices with respect to the Sweep Programs, as described above, constituted unlawful, unfair, misleading, and deceptive business acts and practices in violation of §349 of New York's General Business Law ("GBL").

119.    Defendants' misleading and deceptive business acts and practices with respect to the Sweep Programs adversely impacted Plaintiff and the Class, and, therefore, constituted consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Class.

120.    Accordingly, Plaintiff and the Class seek appropriate relief under GBL §349, including injunctive relief and damages.

## COUNT IX

### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

121.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

122.    Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the Class unreasonably low and below-market interest payments on their balances in

the Sweep Programs.  These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

123.    As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

124.    Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.    Awarding treble damages in favor of Plaintiff and the Class;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

E.    Ordering rescission of the Program Documents and restitution of all fees and other benefits received by Defendants thereunder; and

F.    Such other and further relief as the Court deems appropriate.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: February 25, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
STEPHEN R. ASTLEY
ANDREW T. REES
RENE A. GONZALEZ
SCOTT I. DION

*s/ Stephen R. Astley*
STEPHEN R. ASTLEY

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sastley@rgrdlaw.com
arees@rgrdlaw.com
rgonzalez@rgrdlaw.com
sdion@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
MARY ELLEN CONNER
WILLIAM W. STONE
Murray House
40 Power Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
michaelf@johnsonfistel.com
maryellenc@johnsonfistel.com
williams@johnsonfistel.com
Attorneys for Plaintiff

*Attorneys for Plaintiff*